1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

SUSAN S. CHURCH, Derivatively on
Behalf of COCRYSTAL PHARMA, INC.,

Plaintiff,

v.

ELLIOT MAZA, JEFFREY MECKLER,
GERALD MCGUIRE, JAMES MARTIN,
CURTIS DALE, RAYMOND SCHINAZI,
GARY WILCOX, DAVID S. BLOCK,
PHILLIP FROST, JANE HSIAO, STEVEN
RUBIN, and BRIAN KELLER,

Defendants,

and

COCRYSTAL PHARMA, INC.,

Nominal Defendant.

No.

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Susan S. Church ("Plaintiff"), by her undersigned attorneys, derivatively and on

behalf of Nominal Defendant Cocrystal Pharma, Inc. ("Cocrystal" or the "Company"), files this

Verified Stockholder Derivative Complaint against Elliot Maza ("Maza"), Jeffrey Meckler

("Meckler"), Gerald McGuire ("McGuire"), James Martin ("Martin"), Curtis Dale ("Dale"),

Raymond Schinazi ("Schinazi"), Gary Wilcox ("Wilcox"), David S. Block ("Block"), Phillip

Frost ("Frost"), Jane Hsiao ("Hsiao"), Steven Rubin ("Rubin"), and Brian Keller ("Keller" and,

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  collectively, the "Individual Defendants").  Plaintiff alleges the following upon personal

2  knowledge as to herself and her own acts, and upon information and belief as to all other

3  matters, based on the investigation conducted by her attorneys.  This investigation included,

4  among other things, an analysis of:  (i) the Company's announcements and press releases;

5  (ii) filings made by the Company with the United States Securities and Exchange Commission

6  ("SEC"); (iii) corporate governance documents available on the Company's website; (iv) a

7  purported class action lawsuit filed in the United States District Court for the District of New

8  Jersey against Cocrystal and certain of the Individual Defendants alleging violations of the

9  federal securities laws based on the alleged issuance of false and misleading statements of

10  material fact, and the alleged omission of material facts necessary to make other issued

11  statements not misleading, between September 23, 2013 and September 7, 2018 (the "Relevant

12  Period"), with respect to the Company's participating in a series of pump-and-dump schemes

13  (the "Securities Class Action"); (v) an action brought by the SEC against Frost, OPKO Health,

14  Inc. ("OPKO"), Frost Gamma Investments Trust ("FGIT"), Southern Biotech, Inc. ("Southern

15  Biotech"), as well as Barry Honig ("Honig"), John O'Rourke ("O'Rourke"), and Michael

16  Brauser ("Brauser") for illegally engaging in three pump-and-dump schemes (the "SEC Action"

17  or "SEC Complaint"); (vi) an action brought by Daniel Fisher ("Fisher") in the United States

18  District Court for the Northern District of California against Frost, Honig, Brauser, Maza,

19  Keller, and others alleging violations of, *inter alia*, the Civil Racketeering Influenced and

20  Corrupt Organizations ("RICO") Act, fraud, the securities and Exchange Act of 1934 (the

21  "Fisher Complaint"); (vii) an action brought in the State Court of Minnesota against Frost,

22  Keller, OPKO, and Cocrystal related to multiple pump-and-dump schemes at BioZone

23  Pharmaceuticals, Inc. ("BioZone") and OPKO (the "Pederson Complaint"); and (viii) news

24  reports and other publicly available information about the Company.

25  ## I.  NATURE OF THE ACTION

26      1.      This stockholder derivative action arises from the Individual Defendants'

27  breaches of fiduciary duties owed to the Company, as well as their unjust enrichment, waste of

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 2

corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC Rule 14a-9 promulgated thereunder.  This action is brought on behalf of nominal defendant Cocrystal against certain of Cocrystal's current and former officers and members of the Company's Board of Directors (the "Board"), as well as entities and individuals controlled by and/or closely aligned with defendant Frost that have colluded with Frost and/or Cocrystal's directors and officers to cause significant harm to the Company.

2.      Cocrystal is a Delaware biotechnology company, headquartered in Washington, that specializes in the development of antiviral drug therapies.  The Company was formerly incorporated in Nevada under the name BioZone Pharmaceuticals, Inc. and subsequently reincorporated in Delaware under the name Cocrystal Pharma, Inc. after undergoing a reverse merger with the company Cocrystal Discovery, Inc. ("Cocrystal Discovery").

3.      BioZone was initially a privately-held company headquartered in California, called BioZone Laboratories, Inc. ("BioZone Labs").  BioZone Labs had developed and patented valuable technology for facilitating the body's absorption of drugs.  This technology attracted the attention of defendant Frost, who, as Chief Executive Officer ("CEO") of OPKO and an investor in many drug therapy companies, had a strong interest in BioZone Labs' products.

4.      Defendant Frost, together with Honig and Brauser, convinced the co-founders of BioZone Labs, Keller and Fisher, to allow their company to be taken public as a means of generating increased capital to improve the company's research and development efforts.  Fisher and defendant Keller were promised between $8 and $15 million in investment capital, along with equity stakes in the new company, and a guarantee of continued employment.  However, once BioZone Labs was taken public through a reverse merger with a shell corporation managed by Honig, the business was essentially taken away from Fisher and placed under the control of defendant Maza, a close business associate of Honig.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 3

5.      BioZone Labs was renamed BioZone, and soon after, defendant Frost, Honig, and Brauser, in concert with defendants Maza and Keller, began to orchestrate a plan to artificially inflate BioZone's stock price and sell their accumulated shares at a significant profit. With the assistance of O'Rourke and the stock promoter, John Ford ("Ford"), defendant Frost and his associates successfully manipulated BioZone's stock price by arranging undisclosed stock promotions and deceptively increasing the trading volume of the company's stock.  As a result of their efforts, BioZone's stock price more than doubled, despite a complete lack of any change or improvement in the company.

6.      After Frost and his associates reaped large profits by selling their shares at the artificially inflated price, they carried out another reverse merger through which BioZone became Cocrystal.  The merger was executed by combining BioZone with another company, Cocrystal Discovery, with which Frost was closely affiliated.

7.      Through the reverse merger, Cocrystal absorbed BioZone and the accompanying liability incurred from Frost, Honig, Brauser, and their associates' pump-and-dump scheme. However, despite having ample opportunity to do so, the Individual Defendants never once alerted the investing public that the Company faced the possibility of regulatory scrutiny and the concomitant costs.  In addition, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by soliciting Cocrystal stockholder votes for director re-election, while simultaneously misrepresenting and/or failing to disclose the potential liability faced by the Company as a result of its continued affiliation with defendant Frost.

8.      As a result of the Individual Defendants' actions, Cocrystal will be forced to spend millions of dollars to defend itself against the claims of the pending securities class action, to undertake internal investigations, and expenses related to the investigation being carried out by the Federal Bureau of Investigation.  The Company has already paid millions of dollars to certain officers and directors who were unjustly enriched while engaging in the pump-and-dump scheme and/or the concealment of that scheme.  Furthermore, much of Cocrystal's credibility relied on Frost and his impeccable reputation in the biotechnology investment

community, which has now been decimated by his participation in multiple pump-and-dump schemes.

9.      The defendant officers and directors of Cocrystal breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein.  As a direct and proximate result of those breaches of fiduciary duties, Cocrystal has sustained damages as described below.

## II.      JURISDICTION

10.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Court also has subject matter over the claims asserted herein pursuant to 28 U.S.C. § 1332 as plaintiff is a citizen of a different state than all the defendants and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

11.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because (i) nominal defendant Cocrystal is headquartered in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iii) defendants have received substantial compensation and other transfers of money in this district by doing business and engaging in activities having an effect in this district.

## III.      PARTIES

13.      Plaintiff is a current stockholder of Cocrystal common stock and has continuously held Cocrystal common stock since October 1, 2013.  Thus, Plaintiff was a shareholder at the time of the transactions complained of herein.  Plaintiff is a citizen of Utah.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 5

*Nominal Defendant Cocrystal*

14.    Nominal Defendant Cocrystal is a Delaware biotechnology corporation with its principal executive offices located at 19805 N. Creek Parkway, Bothell, Washington 98011. Cocrystal stock trades on NASDAQ under the ticker symbol "COCP."

*The Individual Defendants*

15.    Defendant Maza was the CEO and Chief Financial Officer ("CFO") of BioZone from July 2011 through January 2014.  Maza was also a director of BioZone from July 2011 through January 2014.  Between 2011 and 2013, defendant Maza was paid over $1.2 million in compensation and bonuses.  Maza is a citizen of New York.

16.    Defendant Meckler was the interim CEO of Cocrystal from March 2015 to September 2015 and the CEO from September 2015 until July 2016.  Meckler was a Company director from March 2015 through July 2016.  In 2015, Meckler received compensation of $9,371,371, with $214,504 in salary, $140,325 as a bonus, and $9,016,542 in option awards.  In 2016, he received compensation of $237,709.  Meckler is a citizen of New York.

17.    Defendant McGuire was the CFO and Treasurer of Cocrystal from January 2014 until November 2015.  In 2014, McGuire received compensation of $150,000, with $100,000 in salary and $50,000 in a bonus for compensation dated to 2014.  In 2015, he received compensation of $210,460, with $143,750 in salary, $50,000 in a bonus, and $16,710 in other compensation.  McGuire is a resident of New York.

18.    Defendant Keller, along with non-party, Daniel Fisher, was a co-founder of BioZone Labs.  Keller was the Chief Scientific Officer ("CSO") of BioZone, a director, and a stockholder of the Company.  Keller is currently the President of Sales and Senior Vice President of Research and Development at Cocrystal.  In 2011, Keller received compensation of $135,712.  In 2012, Keller received compensation of $198,961.  In 2013, he received $198,750, all in salary.  Keller is a resident of California.

19.    Defendant Martin has been the CFO of Cocrystal since June 2017.  Martin previously served as the interim CFO between February 2017 and June 2017.  In 2017, Martin

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

received compensation of $199,559, with $134,654 in salary and $64,905 for consulting services prior to joining the Company.  Martin is a resident of Florida.

20.     Defendant Dale was Cocrystal's CFO from November 2015 until January 2017. In 2015, Dale received compensation $132,738.  In 2016, he received compensation of $197,820.  Dale is a resident of Georgia.

21.     Defendant Wilcox is the Vice Chairman of Cocrystal and has served as the Interim CEO of Cocrystal since July 2016.  Wilcox previously served as the Company's CEO from January 2014 until March 2015.  Wilcox has been a director of Cocrystal Discovery, then Cocrystal, since January 2008 and has served as a part-time consultant to the Company since March 2015.  In 2014 he received compensation of $244,960.  In 2015, he received compensation of $133,487.  In both 2016 and 2017, he received compensation of $100,643. Wilcox is a resident of Washington.

22.     Defendant Schinazi serves as the Chairman of Cocrystal's Board.  He joined the Board after his company, RFS Pharma, LLC merged with Cocrystal in November 2014. Schinazi is on the Nominating and Corporate Governance Committee.  In 2015, Schinazi received compensation of $398,802.

23.     Defendant Block has served as a director of Cocrystal since November 2014. Block is a member of  the Audit Committee and has been the Chairman of the Compensation Committee since November 2014.  In 2015, he received compensation of $383,802.

24.     Defendant Frost has been a director of Cocrystal since January 2014 and is a member of the Audit Committee.  Frost is the Chairman and CEO of OPKO and the former Chairman of Teva Pharmaceuticals ("Teva").  Teva acquired IVAX Corporation in 2006, where Frost had served as Chairman and CEO since 1987.  Frost is a member of the Frost Group, LLC (the "Frost Group") and the Frost Gamma Investments Trust ("FGIT"), along with defendants Hsiao and Rubin.  In 2015, Frost received compensation of $368,302, with $27,500 in fees earned and $340,802 in option awards.  He also received 350,000 10-year stock options exercisable at $1.17 beginning in April 2016.  Frost is a resident of Florida.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

25.     Defendant Hsiao has been a director of Cocrystal since January 2014 and serves as the Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.  Hsiao has an extensive professional relationship with Frost. Hsiao works alongside Frost as the Vice Chairman and Chief Technical Officer of OPKO.  She also worked with Frost in her former position as Vice Chairman of IVAX from 1995 to January 2006, when IVAX was acquired by Teva.  In 2015, she received compensation of $376,302, with $35,500 in fees earned and $340,802 in option awards.  Hsiao also received 350,000 10-year stock options exercisable at $1.17 beginning in April 2016.  Hsiao is a resident of Florida.

26.     Defendant Rubin has been a director of Cocrystal since January 2014 and is the Chairman of the Audit Committee and a member of both the Compensation and the Nominating and Corporate Governance Committees.  Rubin has a close professional relationship with Frost. He is the Executive Vice President-Administration and a has served as a director at OPKO since May 2007.  He was formerly Senior Vice President and General Counsel of IVAX.  Rubin has also served as an advisor to MabVax Therapeutics Holdings, Inc., a company in which Frost has heavily invested and a named defendant in the SEC Complaint.  Rubin was also a director of Chromadex, another company in which Frost's investment group has heavily invested.  In 2015, Rubin received compensation of $378,802, with $38,000 in fees earned and $340,802 in option awards.  He also received 350,000 10-year stock options exercisable at $1.17 beginning in April 2016.  Rubin is a resident of Florida.

27.     Defendants Frost, Hsiao, Rubin, Wilcox, Schinazi, and Block are collectively referred to herein as the "Director Defendants."

28.     Defendants Meckler, McGuire, Martin, Schinazi, Wilcox, Block, Frost, Hsiao, Rubin, Maza, and Keller are referred to herein as the "Individual Defendants."

***Relevant Non-Parties***

29.     Non-party Honig has reportedly helped dozens of small companies go public, primarily through mergers with the shells of failed or failing businesses, in return for significant amounts of stock or convertible notes.  Honig played an instrumental role in the pump-and-

dump scheme with Frost and profited enormously from his actions.  Honig sold 5,892,689 shares of his stock in BioZone for $3,416,455 in proceeds after he assisted defendant Frost in artificially inflating the price of the securities well beyond their worth.  Honig is a citizen of Florida.

30.     Non-party Stetson was a stockholder of BioZone and participated in the scheme to artificially inflate the Company's stock prices.

31.     Non-party Brauser was a stockholder of BioZone and participated in the scheme to artificially inflate the Company's stock prices.

32.     Non-party Mark Groussman ("Groussman") was a shareholder of BioZone, and participated in the scheme to artificially inflate the Company's stock prices.

33.     Non-parties Honig, Stetson, Brauser, and Groussman, together with defendant Frost are sometimes referred to herein as the "Frost Gang."

34.     The Individual Defendants participated in the issuance and preparation of materially false and/or misleading statements by Cocrystal, including press releases and SEC filings.  Because of the Individual Defendants' positions with Cocrystal, they were aware of the adverse material non-public information about the business of Cocrystal, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

## IV.     THE DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers and/or directors of Cocrystal, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

stockholders equally and not in furtherance of their personal interest or benefit.  Each officer and director owe to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

37.    As senior executive officers, directors, and/or controlling stockholders of a publicly-traded company, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Cocrystal's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

38.    To discharge their duties, the officers and directors of Cocrystal were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Cocrystal were required to, among other things:

a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.    conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    e. remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    f. ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

39. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## V. SPECIFIC CORPORATE GOVERNANCE RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS

40. The Company has adopted a Code of Ethics (the "Code") that applies to all directors, officers, and employees of Cocrystal.  According to the Company, the Code provides:

> Written standards that we believe are reasonably designed to deter wrongdoing and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, full, fair, accurate, timely and understandable disclosure and compliance with laws, rules and regulations, including insider trading, corporate opportunities and whistle-blowing or the prompt reporting of illegal or unethical behavior.

41. In addition to the ethical conduct required by the Code, the various committees of the Board have set forth member responsibilities in their charters.  According to the Company's definitive proxy statement filed on Form DEF 14A with the SEC on June 26, 2018, "[t]he Board is actively involved in the oversight of risks that could affect Cocrystal.  This

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

oversight is conducted primarily through the Audit Committee, but the full Board has retained responsibility for general oversight of risks."

42.   The Audit Committee has created its own charter, which states in pertinent part:

**DUTIES AND RESPONSIBILITIES**

The Committee shall have the following authority and responsibilities:

*          *          *

- To review and discuss with management policies and guidelines to govern the process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

- To review the Company's compliance with applicable laws and regulations and to review and oversee any policies, procedures and programs designed to promote such compliance.

43.   The Corporate Governance and Nominating Committee Charter states in pertinent part:

**PURPOSE**

The Corporate Governance and Nominating Committee (the "Committee") is a standing committee of the Board of Directors of Cocrystal Pharma, Inc. (the "Company"). The purposes of the Committee are: (1) to identify individuals qualified to become members of the Board of Directors, consistent with criteria approved by the Board of Directors; (2) to select the director nominees for the next annual meeting of stockholders or special meeting of stockholders at which directors are to be elected; (3) to recommend candidates to fill any vacancies on the Board of Directors; (4) to develop and recommend to the Board of Directors a set of corporate governance guidelines applicable to the Company; and (5) to oversee the evaluation of the Board of Directors and management.

*          *          *

**DUTIES AND RESPONSIBILITIES**

*          *          *

*5. Director Selection Criteria.*   The Committee shall select directors, who shall reflect at a minimum any requirements of applicable law or listing standards and which selection shall be in

compliance with any applicable existing contractual obligations or criteria set forth in the Company's constituent documents. In selecting and recommending candidates for election to the Board of Directors or appointment to any committee of the Board of Directors, the Committee does not believe that it is appropriate to select nominees through mechanical application of specified criteria. Rather, the Committee shall consider such factors at it deems appropriate, including, without limitation, the following: (a) personal and professional integrity, ethics and values. . . (g) practical and mature business judgment[.]

*       *       *

*7. Removal of Directors.* In appropriate circumstances, the Committee, in its discretion, shall consider and may recommend the removal of a director, in accordance with the applicable provisions of the Company's certificate of incorporation and bylaws. If the Company is subject to a binding obligation that requires director removal structure inconsistent with the foregoing, then the removal of a director shall be governed by such instrument.

*8. Evaluation.* The Committee shall oversee the evaluation of the Board of Directors and management.

*       *       *

*12. Investigation of Other Matters.* In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention.

44.   The Individual Defendants failed to maintain the standards laid out by law and by the Company itself, resulting in the breaches of fiduciary duty and violations of Section 14(a) and Rule 14a-9 described herein.

## VI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

46.   The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, waste

of corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

47.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully and/or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who is a director of Cocrystal was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

49.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cocrystal and was at all times acting within the course and scope of such agency.

## VII.   SUBSTANTIVE ALLEGATIONS

*Background of the Company*

50.     Cocrystal is a Delaware biotechnology corporation which purports to develop treatments for human viral diseases, with a specific focus on viral replication inhibitors. Cocrystal is the most recent iteration of a company that was previously incorporated in Nevada under the name BioZone Pharmaceuticals, Inc.

51.     In late 2010, a private company attracted the attention of billionaire biotech investor, defendant Frost.  The company, BioZone Labs, was co-founded by defendant Keller and Daniel Fisher in 1989 and was engaged in the production of pharmaceuticals as a contract

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  manufacturer for other biotechnology companies.  Over time, Fisher and Keller also developed

2  and patented certain technologies that worked in tandem with various pharmaceuticals to

3  facilitate drug absorption by the body.

4       52.    On January 10, 2011, Fisher and Keller travelled to Florida and made a

5  presentation to Frost, Roberto Prego-Novo ("Prego-Novo"), Brauser, and Honig (the "Frost

6  Investors"), in the hopes of receiving capital investment to bolster BioZone Labs'

7  biotechnology development.  After a period of negotiations, BioZone Labs entered into a

8  binding letter of intent on January 28, 2011.  The letter was signed by Brauser and

9  memorialized the Frost Investors' intent to invest $8 million in BioZone Labs as a method of

10  generating financing for research and development at the company.  Fisher was also promised

11  significant equity interest in the new company, continued employment, and re-payment of the

12  loans he previously made to BioZone Labs.  At the time that the Frost Investors began

13  discussions about investing in BioZone Labs, the company had a healthy cash flow, minimal

14  debt, one hundred employees, and a consistent source of revenue from its manufacturing and

15  pharmaceutical segments.

16       53.    In or around March 2011, Prego-Novo and Honig acquired substantial stock in a

17  publicly-held shell corporation, International Surf Resorts, Inc. ("International Surf").  Soon

18  after, on March 4, 2011, International Surf changed its name to BioZone Pharmaceuticals, Inc.

19  and stated that it would no longer operate as an internet provider of international surf resorts,

20  camps, and guided surf tours.  Instead, the company planned to pursue bio-pharmaceutical

21  businesses and in conjunction with this pivot, announced its purchase of BioZone Labs.  A

22  reverse merger was carried out, through which BioZone Labs became a public company.

23       54.    Following the merger of BioZone Labs into BioZone, defendant Maza, an

24  associate of Honig and Brauser, was appointed as CFO and General Counsel and was

25  subsequently named president and CEO of BioZone in September 2011.  Under Maza's

26  leadership, BioZone was used by the Frost Investors for their own personal gains.  According to

27  the SEC Complaint, in connection with the reverse merger, "Honig, Brauser, and Frost arranged

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 15

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   the sale of certain unprofitable Frost assets to the public company in exchange for 8,345,310

2   shares and the obligation of the company to file a registration statement for these shares,

3   providing further value to Frost."

4       55.     Defendant Frost and Honig, Brauser, Groussman, and Stetson controlled the

5   overwhelming majority of BioZone's stock and its corporate address was the same as that of

6   Honig, Brauser, Frost, and OPKO.  Honig and Brauser also controlled the Company's

7   management through their close relationship with defendant Maza.  For example, the SEC

8   Complaint alleges that "at the direction of Honig and Brauser, Maza agreed to divert funds from

9   [BioZone] to pay rent for the office of an unrelated entity co-owned by Honig and Brauser."

10      56.     On December 8, 2011, Fisher filed a whistleblower complaint with the SEC,

11  alleging that Frost, Honig, Maza, and Brauser committed fraud, violated the securities laws, and

12  severely mismanaged BioZone.  Fisher alleged that Maza and the Frost Investors were causing

13  BioZone to file materially misleading and untrue documents with the SEC, which gave

14  investors an inaccurate picture of the company's financial situation and business prospects in an

15  effort to inflate BioZone's stock price.

16      57.     In response to Fisher's repeated concerns, defendant Maza terminated Fisher's

17  employment by e-mail on February 3, 2012.  Fisher was pushed out of the company he started

18  decades ago as a result of his concern over Maza and the Frost Investors' actions, while his co-

19  founder, Keller, fell in line and became a director and the CSO of BioZone.

20      58.     Between February 24, 2012 and March 12, 2012, the Frost Investors carried out

21  a series of private investment in public equity financings, including the issuance of warrants for

22  additional shares.  Far from the committed investments promised by the Frost Investors in 2011,

23  their meager investments were the minimum required to keep BioZone from dissolving while

24  funding substantial compensation for defendants Maza and Keller.  As a result of the Frost

25  Gang's manipulation of BioZone, and with the assistance of defendants Maza and Keller,

26  BioZone was forced to abandon substantially all of its research and development efforts by mid-

27  2012.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 16

*The Pump and Dump Scheme*

59.     In or around April 2013, Honig, Frost, Brauser, Maza, and Keller began to orchestrate a scheme to personally profit from the Company.  Pursuant to their agreement, each party would hold or sell their shares collectively.  The parties together amassed over 44 million shares of BioZone, or approximately 71 percent of the company.  Honig alone held approximately 5.5 million shares of BioZone in 2013.

60.     Defendants Maza and Keller knew that the Frost Gang worked together to create a group, but did not notify BioZone's other stockholders or the investing public.  Furthermore, according to the SEC Complaint, Maza and Keller "signed [BioZone's] public filings, in which they knowingly or recklessly omitted to disclose the share ownership as a group of Honig, Brauser, Frost, Stetson, and Groussman, or the size of each of their holdings."

61.     In September 2013, Honig directed defendant Stetson to deposit nearly four million of Honig's BioZone shares into a brokerage account.  Defendants Stetson, Honig, and Maza then worked together to ensure that restrictive legends were removed from these shares so as not to be restrained by the volume limitations of the federal securities laws.

62.     Honig then contacted O'Rourke whom he directed to pay John Ford ("Ford"), a known stock promoter, 180,000 shares of Cocrystal to write an article on *Seeking Alpha* aimed at inflating the price of BioZone stock.  The article emphasized Frost's investment in the company, with the aim of increasing trading interest in the stock.

63.     Then on September 23, 2013, Honig and his associates began to trade in BioZone securities to create the false appearance of organic market activity just before Ford's article was published.  Trading volume increased from zero on September 20, 2013 to 302,000 on September 23, 2013.  The SEC Complaint alleges that the Frost Gang killed two birds with one stone by compensating Ford for his stock-promoting article while simultaneously generating deceptive trade volume.  Specifically, the Complaint states that:

> O'Rourke called Ford and told him to put in buy orders for
> [BioZone] stock at $0.40 in order to ensure his order was executed
> against the corresponding sell order placed by Honig.  Honig then

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

sold 180,000 [BioZone] shares to Ford at $0.40 in a coordinated trade, a price well below the price at which these shares otherwise traded during that day.

64.     On September 26, 2013, *Seeking Alpha* published the promotional article by Ford titled, "Opko And Its Billionaire CEO Invested In Biozone."  Contrary to *Seeking Alpha*'s publication requirements, Mr. Ford did not disclose that he was compensated for writing the article.  Ford stated:  "I wrote this article myself and it expresses my own opinions.  I am not receiving compensation for it (other than from *Seeking Alpha*).  I have no business relationship with any company whose stock is mentioned in this article."  The article has since been removed from the website, due to an unspecified violation of *Seeking Alpha*'s Terms of Use.  Although the article is no longer publicly available, the Pederson Complaint alleged that Ford emphasized Frost's involvement in BioZone, misstated the Company's current cash position, and disregarded other significant liabilities.

65.     The SEC Complaint emphasized Ford's "bullish outlook" for BioZone which he stated "should be trading for more than twice today's valuation."  The article also included an interview with defendant Keller in which he stated that BioZone had a "formulation ready for testing to be brought to the billion-dollar injectable drug market."  In fact, no such drug existed and the interview with defendant Keller was merely a ploy intended to inflate BioZone's stock price.

66.     The article was effective:  on the day before the article was published, 1,100 shares of BioZone were traded.  On the following day, that number rose to over 4.5 million shares.  On October 2, 2013, BioZone's trading volume exceeded six million shares.  The share price also increased from an average of approximately $0.48 in August 2013 to $0.97 on October 17, 2013.  Throughout the following three months, Honig, Frost, Brauser, Groussman, Stetson, O'Rourke, and a number of their controlled entities sold more than 15 million shares of BioZone, generating approximately $9.25 million in profits.

67.     The company Alpha Capital Anstalt ("Alpha") was a frequent co-investor with Honig and participated in a number of rounds of financing of BioZone.  After Fisher filed his

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  complaint against the Frost Gang and others related to the fraudulent transfer of BioZone Labs,

2  Honig and Brauser arranged a settlement with Fisher, pursuant to which Fisher agreed to

3  disavow his ownership in 6,650,000 shares of BioZone to which he was previously entitled.

4  The Frost Gang then facilitated a deal by which Alpha was offered 1.5 million of Fisher's

5  shares at the incredibly low price of $0.15 per share.  Alpha carried out this purchase with the

6  intention of selling the shares into the inflated market created at the peak of the pump-and-dump

7  scheme.  Biozone issued the shares to Alpha on September 23, 2013, just days before the Ford

8  article was published and well after the Frost Gang had begun to put their pump-and-dump plan

9  into motion.

10      68.      Between October 3, 2013 and November 18, 2013, Alpha, alongside the Frost

11  Gang, sold 3.7 million BioZone shares for proceeds of $2,513,724, including virtually all of the

12  shares Alpha had obtained in September 2013.  Between October 1 and 4, 2013, defendant Frost

13  sold 1,987,991 BioZone shares for proceeds of approximately $1.1 million.

14  ***BioZone Merges With Cocrystal***

15      69.      After using BioZone as a vehicle for his personal profit, defendant Frost began to

16  systematically dismantle BioZone to allow his other affiliated companies to profit from

17  BioZone's assets.  On November 12, 2013, BioZone announced that it had entered into an asset

18  purchase agreement with MusclePharm Corporation ("MusclePharm"), a nutritional supplement

19  company heavily financed by Frost.[1]  Pursuant to the agreement, MusclePharm would acquire

20  substantially all of the operating assets of BioZone.  MusclePharm and OPKO both had a

21  significant interest in the technology owned by BioZone, specifically QuSomes, HyperSorb,

22  and EquaSomes, drug delivery technologies originally developed by BioZone Labs, which

23  facilitate the body's absorption of drugs.  In exchange for all of the assets of BioZone, the

24

25

26  _____
[1] Frost invested $4.4 million in MusclePharm between February and August 2013. MusclePharm
27  is also represented by Harvey Kesner, who is Frost's attorney, and leases its office space from
Frost Real Estate Holdings, LLC, a company owned by Defendant Frost.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 19

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   company would receive 1.2 million shares of MusclePharm.  Absent the assets to be purchased

2   by MusclePharm, BioZone would be of very little value.

3       70.     BioZone was simultaneously in talks with Cocrystal Discovery regarding a

4   strategic transaction while it was negotiating the asset purchase agreement with MusclePharm.

5   On November 27, 2013, BioZone announced that it had signed a letter of intent to merge with

6   Cocrystal Discovery.  The asset purchase agreement with MusclePharm was consummated on

7   January 2, 2014 and on January 3, 2014, BioZone issued a press release in which it announced

8   that the company had finalized its planned merger with Cocrystal Discovery.  Defendant Frost,

9   through the Frost Group and his company, OPKO, owned approximately 40 percent of

10  Cocrystal Discovery.  On March 18, 2014, the Company reincorporated in Delaware under the

11  name Cocrystal Pharma, Inc.

12      71.     Following the merger, defendant Wilcox, who was the CEO and Chairman of

13  Cocrystal Discovery, became the CEO and Chairman of Cocrystal.

14  ***The Individual Defendants Cause the Company to Make False and Misleading Statements***

15      72.     Between 2014 and 2018, certain of the defendants caused the Company to file

16  false and misleading documents with the SEC.  Though repeatedly presented with the

17  opportunity, the Individual Defendants never disclosed that defendant Frost and others had

18  engaged in an illegal pump-and-dump scheme at BioZone before it became Cocrystal through

19  reverse merger and that this would result in scrutiny from the SEC and other potential liability

20  for the Company.  Specifically, the Individual Defendants caused the Company to file four

21  annual reports with the SEC between 2014 and 2018, each of which failed to comply with SEC

22  disclosure regulations and only served to perpetuate the ongoing omissions related to the pump-

23  and-dump scheme.

24      73.     Immediately following the merger, on March 31, 2014, the Company filed its

25  Annual Report for 2013 on form 10-K with the SEC (the "2013 10-K").  Defendants Wilcox,

26  McGuire, Frost, Hsiao, and Rubin all signed the 2013 10-K, which detailed the Company's

27  annual financial results.  Defendants Wilcox and McGuire also signed certifications pursuant to

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 20

Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") in which they attested to the accuracy of financial reporting, disclosure of all material changes to the Company's internal controls, and disclosure of all fraud, while failing to disclose the pump-and-dump scheme and the accompanying potential liability to the Company.

74.     The 2013 10-K included a section titled "Risks Related to Our Common Stock." This section was false and/or misleading as it did not include any mention of the stock promotion scheme at BioZone or the accompanying liability that would follow the Company through its reverse merger with BioZone as a result of its continued affiliation with defendant Frost.  In fact, the 2013 10-K did not include any reference of any kind to the pump and dump scheme.

75.     On March 31, 2015, the Company filed its Annual Report for the year 2014 on Form 10-K with the SEC (the "2014 10-K").  Defendants Wilcox, Schinazi, Frost, Hsiao, Meckler, Rubin, and McGuire all signed the 2014 10-K, which detailed the Company's annual financial results.  Defendants Wilcox and McGuire also signed certifications pursuant to SOX, in which they attested to the accuracy of financial reporting, disclosure of all material changes to the Company's internal controls, and disclosure of all fraud, while failing to disclose the pump-and-dump scheme and the accompanying potential liability to the Company.

76.     The 2014 10-K included a section titled "Risks Related to Our Common Stock." This section was false and/or misleading as it did not include any mention of the stock promotion scheme at BioZone or the accompanying liability that would follow the Company through its reverse merger with BioZone as a result of its continued affiliation with defendant Frost.  The 2014 10-K did not include any reference of any kind to the pump-and-dump scheme.

77.     On March 15, 2016, the Company filed its Annual Report for the year 2015 on Form 10-K with the SEC (the "2015 10-K").  Defendants Meckler, Schinazi, Block, Frost, Hsiao, Rubin, Wilcox, and Dale Frost all signed the 2015 10-K, which detailed the Company's annual financial results.  Defendants Meckler and Dale also signed certifications pursuant to SOX, in which they attested to the accuracy of financial reporting, disclosure of all material

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   changes to the Company's internal controls, and disclosure of all fraud, while failing to disclose

2   the pump-and-dump scheme and the accompanying potential liability to the Company.

3        78.    The 2015 10-K included a section titled "Risks Related to Our Common Stock."

4   This section was false and/or misleading as it did not include any mention of the stock

5   promotion scheme at BioZone or the accompanying liability that would follow the Company

6   through its reverse merger with BioZone as a result of its continued affiliation with defendant

7   Frost.  The 2015 10-K did not include any reference of any kind to the pump-and-dump scheme.

8        79.    On March 31, 2017, the Company filed its Annual Report for the year 2016 on

9   Form 10-K with the SEC (the "2016 10-K").  Defendants Wilcox, Schinazi, Block, Frost,

10   Hsiao, Rubin, and Martin all signed the 2016 10-K, which detailed the Company's annual

11   financial results.  Defendants Wilcox and Martin also signed certifications pursuant to SOX, in

12   which they attested to the accuracy of financial reporting, disclosure of all material changes to

13   the Company's internal controls, and disclosure of all fraud, while failing to disclose the pump-

14   and-dump scheme and the accompanying potential liability to the Company.

15        80.    The 2016 10-K included a section titled "Risks Related to Our Common Stock."

16   This section was false and/or misleading as it did not include any mention of the stock

17   promotion scheme at BioZone or the accompanying liability that would follow the Company

18   through its reverse merger with BioZone as a result of its continued affiliation with defendant

19   Frost.  The 2016 10-K did not include any reference of any kind to the pump-and-dump scheme.

20        81.    Finally, on March 21, 2018, the Company filed its Annual Report for the year

21   2017 on Form 10-K with the SEC (the "2017 10-K").  Defendants Wilcox, Schinazi, Block,

22   Martin, Frost, Hsiao, Rubin, and Martin all signed the 2017 10-K, which detailed the

23   Company's annual financial results.  Defendants Wilcox and Martin also signed certifications

24   pursuant to SOX, in which they attested to the accuracy of financial reporting, disclosure of all

25   material changes to the Company's internal controls, and disclosure of all fraud, while failing to

26   disclose the pump-and-dump scheme and the accompanying potential liability to the Company.

27

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 22

82.     The 2017 10-K included a section titled "Risks Related to Our Common Stock." This section was false and/or misleading as it did not include any mention of the stock promotion scheme at BioZone or the accompanying liability that would follow the Company through its reverse merger with BioZone as a result of its continued affiliation with Frost. The 2017 10-K did not include any reference of any kind to the pump-and-dump scheme.

83.     The 2017 10-K also failed to disclose to stockholders that the Pederson Complaint was filed on October 27, 2017 and included allegations against both Frost and the Company related to the pump-and-dump scheme. More specifically, the 2017 10-K failed to disclose that Frost, one of the Company's largest shareholders and a director, had been accused of an elaborate pump-and-dump scheme at BioZone or that, if found to be true, these allegations could seriously harm the Company.

84.     The Individual Defendants admittedly failed to maintain effective internal controls over financial reporting throughout the Relevant Period. In each Form 10-K filed with the SEC between 2014 and 2018, the Individual Defendants stated that the Company continued to have material weaknesses in its internal control over financial reporting. Specifically, the 2017 10-K stated:

> We continue to have material weaknesses in our internal control over financial reporting. If we are unable to remediate these material weaknesses, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect investor confidence in us and could negatively impact our ability to raise capital.

> *     *     *

> Although we have developed and are implementing a plan to remediate these material weaknesses and believe, based on our evaluation to date, that these material weaknesses will be remediated during 2018, we cannot assure you that this will occur within the contemplated timeframe. Moreover, we cannot assure you that we will not identify additional material weaknesses in our internal control over financial reporting in the future. If we are unable to remediate the material weaknesses, our ability to record, process and report financial information accurately, and to prepare financial statements within the time periods specified by the rules

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and forms of the Securities and Exchange Commission could be adversely affected.  The occurrence of or failure to remediate the material weaknesses may adversely affect investor confidence in us and could negatively impact our ability to raise capital.

85.     However, despite identifying and disclosing certain material weaknesses in the Company's internal controls, the Individual Defendants failed to provide a complete picture of Cocrystal's material weaknesses by disclosing the liability posed to the Company through its continuing affiliation with Frost.

***The Individual Defendants Issued a Materially False and Misleading Proxy Statement***

86.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants also caused the Company to issue a false and misleading proxy statement, which sought stockholder votes for director re-election.

87.     On June 26, 2018, the Individual Defendants caused the Company to file with the SEC and disseminate to stockholders the Company's definitive proxy statement on Form DEF 14A (the "2018 Proxy") in connection with the Company's annual stockholder meeting. The Individual Defendants drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to Cocrystal stockholders.  The Individual Defendants negligently issued materially misleading statements in the 2018 Proxy.  These 2018 Proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2018 Proxy allegations and related claims.

88.     Among other things, the 2018 Proxy provided information about the director nominees up for election, including defendant Frost.  The 2018 Proxy also described the responsibilities of Company directors and Board committees, such as risk assessment by the Audit Committee, and the duty of officers and directors to ethically handle conflicts of interest

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

between personal and professional relationships and to timely disclose any illegal or unethical behavior.

89.     The 2018 Proxy described the Board's role in risk assessment as follows:

> The Board is actively involved in the oversight of risks that could affect Cocrystal. This oversight is conducted primarily through the Audit Committee, but the full Board has retained responsibility for general oversight of risks. . . In addition to the Audit Committee's role, the full Board is involved in oversight and administration of risk and risk management practices.

90.     In addition, the 2018 Proxy made the following representations with respect to the responsibilities of the Corporate Governance and Nominating Committee:

> The responsibilities of the Corporate Governance and Nominating Committee include the identification of individuals qualified to become Board members, the selection of nominees to stand for election as directors, the oversight of the selection and composition of committees of the Board, establish procedures for the nomination process including procedures and the oversight of the evaluations of the Board and management.

91.     The 2018 Proxy was false and misleading because it solicited Cocrystal stockholder votes for director re-election but failed to disclose that:  (1) defendant Frost and others had engaged in an illegal pump-and-dump scheme at BioZone before it became Cocrystal through a reverse merger; (2) this could result in scrutiny from the SEC and other potential liability for the Company; (3) in fact, at least one complaint, the Pederson Complaint, had already been filed on October 27, 2017, naming Frost and Cocrystal as defendants and containing serious allegations related to the pump-and-dump scheme; and (4) the Company's continued affiliation with defendant Frost and his directorship could have a detrimental impact on the Company and its reputation.

***The Truth Is Revealed***

92.     On October 27, 2017, the Pederson Complaint was filed in Minnesota State Court.  The Pederson Complaint included detailed allegations about the 2013 pump-and-dump scheme as well as allegations of wrongdoing in connection with BioZone's asset sale to MusclePharm and the merger of BioZone and Cocrystal Discovery.  The Pederson Complaint

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

put the Individual Defendants on notice of the pump-and-dump scheme and the allegations of

wrongdoing against defendant Frost.

93.     None of the officers or directors made any attempt to initiate an internal

investigation or otherwise determine whether the allegations of the Pederson Complaint were

legitimate.  Instead, the Pederson Complaint and the pump-and-dump allegations were virtually

ignored for almost a year.

94.     Then, on September 7, 2018, the SEC issued a press release announcing the

filing of a complaint against, among others, Frost, Honig, O'Rourke, Brauser, Maza, Keller, and

OPKO.  The release, titled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market

Manipulation Schemes," stated, in relevant part:

> The Securities and Exchange Commission today charged a group
> of 10 individuals and 10 associated entities for their participation
> in long-running fraudulent schemes that generated over $27
> million from unlawful stock sales and caused significant harm to
> retail investors who were left holding virtually worthless stock.
>
> According to the SEC's complaint, from 2013 to 2018, a group of
> prolific South Florida-based microcap fraudsters led by Barry
> Honig manipulated the share price of the stock of three companies
> in classic pump-and-dump schemes.  Miami biotech billionaire
> Phillip Frost allegedly participated in two of these three schemes.
> Honig allegedly orchestrated the acquisition of large quantities of
> the issuer's stock at steep discounts, and after securing a
> substantial ownership interest in the companies, Honig and his
> associates engaged in illegal promotional activity and manipulative
> trading to artificially boost each issuer's stock price and to give the
> stock the appearance of active trading volume.  According to the
> SEC's complaint, Honig and his associates then dumped their
> shares into the inflated market, reaping millions of dollars at the
> expense of unsuspecting investors.
>
> "As alleged, Honig and his associates engaged in brazen market
> manipulation that advanced their financial interests while fleecing
> innocent investors and undermining the integrity of our securities
> markets," said Sanjay Wadhwa, Senior Associate Director in the
> SEC's Division of Enforcement.   "They failed to appreciate,
> however, the SEC's resolve to relentlessly pursue and punish
> participants in microcap fraud schemes."
>
> The SEC's complaint, which was filed in federal district court in
> Manhattan, charges Honig, John Stetson, Michael Brauser, John R.
> O'Rourke III, Mark Groussman, Frost, Elliot Maza, Robert Ladd,
> Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital

LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., OPKO Health Inc., Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital Investments Inc. with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.

95.     The SEC Complaint alleges that Honig orchestrated the acquisition of a large amount of BioZone's stock at a discount through acquisition of a shell and execution of a reverse merger.  As part of the scheme, the SEC Complaint alleges that Stetson, Brauser, O'Rourke, Groussman, and Frost "either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely."

96.     The SEC Complaint also alleges that the scheme was carried out with the assistance of BioZone management, specifically defendants Maza and Keller.  The Complaint charges Maza with violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and Section 20(e) of the Exchange Act by aiding and abetting BioZone's violations of Section 15(d) of the Exchange Act.  The Complaint charges defendant Keller with violations of Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and Section 15(b) of the Securities Act, and Section 20(e) of the Exchange Act by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act, and Rules l0b-5(a) and (c) thereunder, and by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act, and Rule 15d-1 thereunder.

97.     As a result of this news, the price of Cocrystal stock dropped precipitously over the following weeks from $3.74 per share on September 6, 2018 to $2.31 on September 26, 2018.  Between September 6, 2018, and October 30, 2018, Cocrystal's market capitalization declined by more than $62.5 million.

98.     Following the announcement of the SEC Complaint, Frost stepped down from his position at his brokerage firm, Ladenburg Thalmann Financial Services.  While Frost

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    responded to the SEC Complaint by stating that the allegations against him were baseless,

2    Cocrystal remained silent on the topic, failing to issue a press release or acknowledge the role of

3    its directors and management in the complaint's allegations.

4          99.    Ford, who authored the *Seeking Alpha* articles at the direction of the Frost Gang

5    and was a named defendant in the SEC Complaint, entered into a settlement agreement with the

6    SEC on charges that he took undisclosed payments to tout stocks on *Seeking Alpha* and his

7    personal blog.  On September 21, 2018, the Court in the SEC Settlement entered a judgment

8    against Ford in which he agreed to settle, without admitting or denying the allegations against

9    him, in exchange for adherence to a number of conditions and disgorgement of all gains and

10   prejudgment interest thereon.  The amount of disgorgement and the civil penalty are to be

11   determined by the Court.

## VIII.   DAMAGES TO COCRYSTAL

13         100.    As a result of the Individual Defendants' wrongful conduct, Cocrystal

14   disseminated false and misleading statements and omitted material information to make such

15   statements not false and misleading when made.  The improper statements have devastated

16   Cocrystal's credibility.  Cocrystal has been, and will continue to be, severely damaged and

17   injured by the Individual Defendants' misconduct.

18         101.    Indeed, the Individual Defendants' false and misleading statements and

19   omissions as alleged above, have subjected Cocrystal to a class action lawsuit alleging

20   violations of the federal securities laws.  The action, captioned *Pepe v. Cocrystal Pharma, Inc.*

21   *f/k/a BioZone Pharmaceuticals, Inc., et al.*, Case No. 2:18-cv-14091, is pending in the United

22   States District Court for the District of New Jersey and alleges that Cocrystal and certain of the

23   Individual Defendants made false and/or misleading statements and/or failed to disclose that:

24   (i) defendants were engaged in a pump-and-dump scheme to artificially inflate Cocrystal's stock

25   price; (ii) this illicit scheme would result in governmental scrutiny, including from the SEC; (iii)

26   defendants failed to abide by SEC disclosure regulations; and (iv) as a result, defendants'

27   statements about Cocrystal's business, operations, and prospects were materially false and

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

misleading and/or lacked a reasonable basis at all relevant times.  The securities class action seeks tens of millions of dollars in damages.

102.    As a direct and proximate result of the Individual Defendants' actions, Cocrystal stands to expend millions of dollars in legal fees and payments, in addition to the excessive compensation and benefits that were paid to the Individual Defendants while they were breaching their fiduciary duties to the Company.  Specifically, as a result of the Individual Defendants' breaches, Cocrystal has incurred significant expenses, including, *inter alia*:

    a.    unwarranted distribution of executive compensation;

    b.    increased costs resulting from the loss of market capitalization and the Company's damaged reputation in the investment community;

    c.    substantial costs to carry out internal investigations, including legal fees paid to outside counsel; and

    d.    potential damages related to litigation and/or SEC fines resulting from improperly-reported, overstated profits.

103.    Moreover, these actions have irreparably damaged Cocrystal's corporate image and goodwill.  For at least the foreseeable future, Cocrystal will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Cocrystal's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX.    PLAINTIFF'S DERIVATIVE AND DEMAND ALLEGATIONS

104.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.    Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties.

106.    Plaintiff is an owner of Cocrystal common stock and was an owner of Cocrystal common stock at all times relevant hereto.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

107.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

108.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

109.     At the time of filing, the Board is comprised of six directors:  defendants Schinazi, Wilcox, Block, Frost, Hsiao, and Rubin.  According to the Company's 2018 Proxy Statement, neither Schinazi nor Wilcox are independent directors.  None of the six directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**A.     Demand Is Futile Because The Board Is Controlled By Frost**

110.     Demand on the Board is excused because Frost exercises control over the majority of the directors.  Defendants Hsiao and Rubin were both appointed by Frost, work alongside him at OPKO, and have other extensive business and personal ties with Frost, as alleged herein.  Defendant Wilcox also has a long-standing professional relationship with Frost, as he was CEO of Cocrystal Discovery before becoming CEO of Cocrystal.  Frost invested heavily in Cocrystal Discovery and was largely responsible for its merger with Cocrystal.

111.     Furthermore, defendant Frost's preeminence in the biotechnology and investment communities is a powerful tool.  Frost's investment in Cocrystal and other companies in which the directors may have an interest, is essential to their operation.  The directors are not likely to jeopardize their access to such a powerful figure by instituting an action that would undoubtedly seriously implicate Frost.

112.     The Board knew about the Pederson Complaint as early as October 2017 and they failed to investigate the allegations against Frost, despite their significance, demonstrating the Board's unwillingness to institute any action that could be perceived as contrary to Frost's personal interest.  There is no reason to believe that they would do so in this case.

**B.      Demand Is Futile As To The Director Defendants As They Face A Substantial Likelihood Of Liability**

113.    Each of the directors, defendants Frost, Hsiao, Rubin, Wilcox, Schinazi, and Block, face a substantial likelihood of liability for their individual misconduct.  Each was a director throughout the time of the false and misleading statements, and as such he had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

114.    Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the stability of Cocrystal.

115.    The Director Defendants knowingly made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  The Director Defendants also signed materially false and misleading documents that were filed with the SEC.  These actions constitute breaches of the fiduciary duties of loyalty and good faith for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Cocrystal to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

## C.     Block, Frost, And Rubin Face A Substantial Likelihood Of Liability As Members Of The Audit Committee

116.    Defendants Block, Frost, and Rubin, as members of the Audit Committee, participated in and knowingly approved the filing of false and misleading statements with the SEC.  As members of the Audit Committee, Block, Frost, and Rubin had an obligation to review the Company's annual and quarterly reports and to ensure their accuracy.  Contrary to their obligations, the members of the Audit Committee failed to ensure the integrity of Cocrystal's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and other financial information provided by the Company, such as the risks to its common stock.

117.    As members of the Audit Committee, defendants Block, Frost, and Rubin had an additional duty to ensure that Cocrystal was operated in a lawful manner.  They failed to carry out this duty.  For these reasons, demand is futile as to defendants Block, Frost, and Rubin.

## D.     Defendant Frost Lacks Independence and Is Not Disinterested

118.    Defendant Frost plays a central role in the wrongdoing described herein.  He is currently mired in litigation across the country related to his complicity in numerous pump-and-dump schemes that have led to the financial destruction of numerous companies.  He is a named defendant in all related securities fraud class actions as well as the SEC Complaint.  On January 2, 2019, defendant Frost announced that he would pay $5.5 million to settle the SEC action and his company, OPKO, will pay a $100,000 fine.

119.    Defendant Frost has exercised control over every iteration of Cocrystal and has consistently been one of the Company's largest shareholders.  Defendant Frost faces a substantial likelihood of liability for his wrongdoing and could not independently and fairly consider the institution of an action in which he would be the central figure.  For this reason, demand is futile as to defendant Frost.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**E.      Defendant Wilcox Lacks Independence**

120.      As an initial matter, Cocrystal has conceded that defendant Wilcox is not an independent director.  According to Cocrystal's 2018 Annual Proxy Statement, in light of his position as Interim CEO of the Company, the Board has determined that Wilcox is not an independent director under the applicable SEC rules and regulations and the Nasdaq Stock Market listing requirements and rules.

121.      To properly investigate and prosecute the claims alleged herein, it would be necessary for defendant Wilcox to sue himself and the other Individual Defendants.  This would expose defendant Wilcox and his colleagues to potential civil liability and criminal or SEC sanctions.  This is something Wilcox will not do, particularly in light of the fact that he is also a named defendant in the securities fraud class action.

**F.      Defendant Schinazi Lacks Independence**

122.      Cocrystal has conceded that defendant Schinazi lacks independence.  According to Cocrystal's 2018 Annual Proxy Statement, in light of his position as Chairman of the Board, the Board has determined that Schinazi is not an independent director under the applicable SEC rules and regulations and the Nasdaq Stock Market listing requirements and rules.  Accordingly, demand is futile as to Schinazi.

123.      To properly investigate and prosecute the claims alleged herein, it would be necessary for defendant Schinazi to sue himself and the other Individual Defendants.  This would expose defendant Schinazi and his colleagues to potential civil liability and criminal or SEC sanctions.  This is something Schinazi will not do.

**G.      Demand is Futile as to Hsiao**

124.      Many of the Individual Defendants have interpersonal or business connections that also render them incapable of independently or fairly considering the claims alleged herein. For example, Hsiao and Frost have worked together at IVAX and OPKO for over two decades. Their working relationship dates back to at least 1992 when Hsiao began to work at IVAX. Frost was the Chairman and CEO of Ivax beginning in 1987 and Hsiao was appointed CTO in

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 33

1996 after holding the position of Chief Regulatory Officer.  Hsiao was appointed Vice

Chairman and CTO of OPKO in 2007, where she serves alongside OPKO CEO, Frost.  They

also have a personal relationship – Hsiao's late husband, Charles Hsiao, co-founded IVAX with

Frost and Larry Hsu.  According to an article published in Forbes titled "Meet Miami's

Renaissance Billionaire," Frost, Hsiao, and Rubin are close and regularly eat lunch together at

OPKO's headquarters.

125.    Hsiao and Frost also have a close relationship in the philanthropic realm.  Frost

and his wife, Patricia, are the main benefactors of the Phillip and Patricia Frost Museum of

Science.  In an article in the Miami New Times, titled "New Frost Science Exhibition Shows

How the Brain Rewires Itself After Injury," Daniella Orihuela, discussed a "new exhibition,

which will be divided into seven sections within the museum's Hsiao Family Special Exhibition

Gallery."  Similarly, Frost and his wife also are main benefactors of the Patricia & Phillip Frost

Art Museum.  In a press release discussing the recent exhibition opening for Many Visions,

Many Versions: Art from Indigenous Communities in India, the Frost Art Museum makes clear

that "[t]his exhibition was made possible at the Frost Art Museum through the generous support

of the Jane Hsiao Asian Art Endowment."  The Hsiao Endowment has made many exhibits at

Frost Art Museum possible, illustrating that defendants Frost and Hsiao have such a close

business and personal relationship that neither could independently consider a demand against

the other.

126.    Hsiao has also served in numerous capacities in Frost-affiliated and controlled

companies.  For instance:

        a.      She is a director of Cocrystal;

        b.      She was a director and Vice-Chairman – Technical Affairs of Ivax from

1995 to 2006, during the period when Frost was Chairman and CEO;

        c.      She was Chairman, CEO, and President of IVAX Animal Health from

1998 to 2006, during the period when Frost was Chairman and CEO of parent Ivax;

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 34

       d.      She was a director of TransEnterix since Frost took control on September 3, 2013; and

       e.      She was a director of Prolor Biotech, Inc. from 2008 until it was acquired by OPKO in 2013.

127.    Based on these past and current positions, Hsiao holds large stakes in several Frost entities, including over 306,000 shares in Cocrystal, 4,990,230 shares of TransEnterix, received over $600,000 when Ivax was purchased by Teva, and received over $700,000 when Prolor was acquired by OPKO.  For the foregoing reasons, demand on Hsiao is futile.

**H.    Demand is Futile as to Rubin**

128.    Frost and Rubin also have a close professional relationship that spans over three decades.  In 1986, Rubin quit his job as a mergers and acquisitions attorney to join Frost at IVAX.  Rubin is close friends with Frost and sits on the boards of many of Frost's companies.

129.    Defendant Rubin also worked for Frost's private company, the Frost Group, which describes itself as "a private equity firm specializing in PIPE investments."

130.    Rubin has also served in numerous capacities in Frost-affiliated and controlled companies.  For instance:

       a.      He is a director of Castle Brands, Inc. ("Castle Brands"), in which Frost beneficially owns over 30%;

       b.      He is an advisor to MabVax;

       c.      He was the Interim CEO and CFO and a director of Tiger X Medical, Inc., in which Frost beneficially owns more than 10%;

       d.      He is a director of Cocrystal;

       e.      He was a Senior Vice President, General Counsel, and Secretary of Ivax from 2001 to 2006, during the period when Frost was Chairman and CEO;

       f.      He was a director of Prolor Biotech, Inc. from 2008 until it was acquired by OPKO in 2013;

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

g.      He is a director of Sevion Therapeutics, Inc., now known as Eloxx

Pharmaceuticals, in which both Frost and OPKO have large investments; and

h.      He is a director of ChromaDex, Inc., in which OPKO holds a substantial

position.

131.    Based on these past and current positions, Rubin holds large stakes in several

Frost entities, including over 241,000 shares of Castle Brands and also earned almost $200,000

as a Castle Brands director, 564,952 shares of Cocrystal, held 124,753 shares of Prolor before it

was acquired by OPKO and received over $65,000 as a director, 59,120 shares of Eloxx and

received over $236,000 as a director, 45,311 shares of VBI and received $87,375 as a director,

and received over $137.5 thousand as a director of ChromaDex, Inc.

132.    Defendant Frost faces a significant likelihood of liability for his individual

conduct and given their decades-long professional histories and close friendship, Rubin is

incapable of independently considering any action in which Frost would be implicated.  For the

foregoing reasons, demand on Rubin is futile.

**I.      Additional Demand Futility Allegations**

133.    Furthermore, if Cocrystal's current officers and directors are protected against

personal liability for their breaches of fiduciary duties alleged in this complaint by Directors &

Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that

insurance for their own protection with corporate funds, *i.e.*, monies belonging to the

stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies

covering the Individual Defendants in this case contain provisions that eliminate coverage for

any action brought directly by Cocrystal against the Individual Defendants, known as the

"insured versus insured exclusion."

134.    As a result, if the Director Defendants were to sue themselves or certain of the

officers of Cocrystal, there would be no D&O Insurance protection.  This is a further reason

why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this

action is brought, such insurance coverage exists and will provide a basis for the Company to

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.  Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Cocrystal by prosecuting this action.

135.    Each of the Individual Defendants either participated directly in the wrongdoing alleged or are inextricably linked to defendants who so participated.  For all of the aforementioned reasons, demand on the Board is futile and thus excused.

## COUNT ONE

### Against the Individual Defendants
### For Breach of Fiduciary Duties

136.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

137.    The Individual Defendants each owed Cocrystal and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs either directly by their positions as officers and/or directors of the Company or through their close business relationships with the Company.  The Individual Defendants violated these fiduciary duties – they have engaged in unlawful self-dealing and have acted to put their personal interests and/or their related entities' and business partners' interests ahead of the interests of Cocrystal and its stockholders.

138.    As described herein, the Individual Defendants failed to disclose material information and/or made material misrepresentations to stockholders regarding the pump-and-dump scheme during the Relevant Period.  Each of the defendants had actual or constructive knowledge of and caused the Company to fail to disclose that: (1) Frost, Honig, O'Rourke, Brauser, Maza, Keller, and others were engaged in an illegal pump-and-dump scheme; (2) as a result of the foregoing, Cocrystal would be subject to regulatory scrutiny from government agencies, including the SEC; (3) the Company failed to maintain adequate internal controls; and

(4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. These actions caused severe risks to the Company's financial viability and have caused harm to the Company by subjecting it to the SEC Complaint and at least one securities class action. The defendants' wrongdoing could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Cocrystal and its public stockholders.

140. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, in concert with the other defendants, Cocrystal has sustained, and continues to sustain, significant damages.

## COUNT TWO

### Against the Individual Defendants
### For Constructive Fraud

141. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142. As corporate fiduciaries, the Individual Defendants owed Cocrystal and its stockholders a duty of candor and accurate disclosure regarding the true state of Cocrystal's business and assets and their conduct with regard thereto.

143. As a result of the conduct complained of, the Individual Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Cocrystal's stockholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Cocrystal. Thus, they have committed constructive fraud and violated their duty of candor.

144. Cocrystal has been damaged by the Individual Defendants' violations of their duties of candor and constructive fraud.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

## COUNT THREE

### Against the Individual Defendants
### For Unjust Enrichment

145.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

146.    By their wrongful acts and false and misleading statements and omissions of material fact, the Individual Defendants were unjustly enriched at the expense of Cocrystal through the compensation they received while participating in the wrongdoing alleged herein. The Individual Defendants were not held liable for their misconduct at Cocrystal – conduct that has exposed the Company to tens of millions of dollars in potential liability.  The Individual Defendants should disgorge the profits they have and/or will otherwise unjustly obtain at the expense of Cocrystal.

147.    The compensation and other monetary awards distributed to the Individual Defendants were granted at the expense of Cocrystal.  The Company received no benefit from these payments and Cocrystal was seriously damaged by the payments.

## COUNT FOUR

### Against the Individual Defendants
### For Corporate Waste

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

149.    The Individual Defendants owed Cocrystal the obligation to avoid wasting the Company's assets.

150.    The Individual Defendants breached their obligations to Cocrystal and wasted corporate assets by subjecting the Company to federal securities class action lawsuits and the Pederson Complaint, causing the Company to incur substantial costs.

151.    As a direct and proximate result of the waste of corporate assets by the Individual Defendants, Cocrystal has been and continues to suffer damages.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 39

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

## COUNT FIVE

### Against the Individual Defendants
### For Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

153.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these proxy law claims.

154.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

155.    The 2018 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Cocrystal stockholder votes for director re-election, while simultaneously misrepresenting and/or failing to disclose defendant Frost's involvement with fraudulent schemes and the consequent pending legal action.

156.    As alleged herein, in the 2018 Proxy, the Individual Defendants specifically referenced the Code which includes obligations to the Company to ethically handle conflicts of interest between personal and professional relationships and prompt reporting of illegal or unethical behavior.  The 2018 Proxy also references the specific duty of the Audit Committee, expounded in the Audit Committee Charter, to carry out oversight of risks that could affect Cocrystal.  The Company, at the Individual Defendants' direction, issued false and misleading statements and failed to disclose the fact that defendant Frost participated in numerous pump-and-dump schemes which would attract government scrutiny and significant potential liability

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

for the Company.  Thus, the Individual Defendants violated the Code and the Charters of the Audit Committee and the Corporate Governance and Nominating Committee.  The 2018 Proxy did not disclose that the express terms of the Code and the committee charters were being violated.

157.    The Individual Defendants negligently caused the Company to issue, and participated in the issuance of, untrue statements of material facts and omit material facts necessary to make the issued statements not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

158.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2018 Proxy were materially false and misleading.

159.    The omissions and false and misleading statements in the 2018 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the reelection of directors.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2018 Proxy and in other information reasonably available to stockholders.

160.    As a direct and proximate result of the dissemination of the false and/or misleading 2018 Proxy the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant Cocrystal suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Cocrystal and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that each of the Individual Defendants breached and/or aided and abetted the breach of their fiduciary duties to Cocrystal;

C.    Awarding money damages against all defendants, jointly and severally, for the losses and damages suffered as a result of the acts and transactions complained of herein;

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

D.      Directing all defendants to disgorge all profits obtained from their wrongful conduct and breaches of fiduciary duties, including all payments of cash bonuses;

E.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses;

G.      Awarding pre-judgment and post-judgement interest against the Individual Defendants at the highest rates permissible at law or in equity; and

H.      Granting such other and further relief as the Court deems just and proper.

## XI.     JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 16, 2019.

BRESKIN JOHNSON TOWNSEND, PLLC

By: _s/Roger Townsend_____
        Roger Townsend, WSBA #25525
        1000 Second Avenue, Suite 3670
        Seattle, WA 98104
        Tel:  (206)652-8660
        rtownsend@bjtlegal.com

BRAGAR EAGEL & SQUIRE, P.C.
Melissa A. Fortunato*
101 California Street, Suite 2710
San Francisco, California
Telephone:  (415) 365-7149
fortunato@bespc.com

LEVI & KORSINSKY, LLP
Shannon L. Hopkins*
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Telephone:  (203) 992-4523
shopkins@zlk.com
*Admission *pro hac vice* pending

*Attorneys for Plaintiffs*